## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## BATESVILLE DIVISION

**ANGELA SCHUNCEY RICHARDSON**                                        **PLAINTIFF**
**ADC #712575**

**v.**                            **No: 1:18-cv-00032 DPM-PSH**

**TAMI JO AIKEN,** *et al.*                                        **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to Chief United States District Judge D.P. Marshall Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

## I. Introduction

Plaintiff Angela Schuncey Richardson, an inmate confined at the Arkansas Division of Correction's McPherson Unit, filed this *pro se* action pursuant to 42 U.S.C. § 1983 (Doc. No. 2). Richardson alleges that the defendants violated her

Fourteenth Amendment right to equal protection because of her race and/or sexual orientation.  Richardson sues Assistant Warden Tami Jo Aiken, Assistant Warden John Herrington, Classification Officer Jennie Long, Coach Virginia Spence, and Sergeant Roger Ayers in their official and individual capacities, and seeks both injunctive relief and money damages. *Id.* at 4 & 21.  After screening Richardson's complaint pursuant to 28 U.S.C. §§ 1915(e)(2) & 1915A, the Court determined that Richardson had stated equal protection claims and ordered service of process on these defendants.  *See* Doc. No. 3 at 3.

Richardson's complaint describes a number of instances she claims establish that she was treated differently than other inmates due to her race and/or sexual orientation.  Her allegations of discrimination are related to an Offender Separation Alert in her file that dictated she be separated from fellow inmate R.B. (the "separation order").[1]  Richardson states that the defendants denied her various privileges and benefits due to the separation order, and that they applied it to her differently than similar separation orders were applied to other inmates.

The Court previously determined that Richardson exhausted available administrative remedies with respect to the following equal protection claims: four claims against Classification Officer Long related to Richardson's housing; a claim

---

[1] Individuals who are not parties to this case will be referred to by their initials to respect their privacy.

against Assistant Warden Aiken regarding the unequal treatment of inmates with separation orders; a claim against Sergeant Ayers regarding a disciplinary Richardson received in July 2016; a claim against Assistant Warden Herrington regarding use of the law library in October 2017; a claim against Coach Spence regarding a "Fitness Walk" class; and a claim against Herrington and Spence regarding the "Dance2bfree" fitness class. *See* Doc. Nos. 31 & 43. Richardson's allegations supporting those claims are described in the Court's analysis.

Before the Court is a motion for summary judgment and related pleadings filed by the defendants (Doc. Nos. 69-71). Richardson filed multiple pleadings in response (Doc. Nos. 86-92). For the reasons described herein, the undersigned recommends that defendants' motion for summary judgment be granted.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann*

*v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". Fed. R. Civ. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Facts

In support of their motion for summary judgment, the defendants submitted the following: documentation regarding Richardson's prison sentence and transfer

to the McPherson Unit in 2016; McPherson's policy concerning enemy separations (MCP 9.19.0); Richardson's separation orders; the declaration of each defendant; certain grievance decisions; and an excerpt from Richardson's deposition. *See* Doc. Nos. 69-1 – 69-14. Defendants subsequently filed a complete copy of Richardson's deposition (Doc. No. 93). Except as noted, the following facts are undisputed; disputed facts and the evidence submitted by the parties to support those facts are discussed in the Court's analysis.

### *Richardson's Prison Sentence & Assigned Unit*

Richardson is a 50-year-old African-American woman serving a sixty-month sentence for theft of property obtained by threat of serious physical injury. Doc. No. 69-6, *Penitentiary Pack,* at 2. On March 17, 2016, Richardson was transferred from the Arkansas Division of Corrections' Hawkins Unit to the McPherson Unit. *Id.* at 3. Her status assignment sheet indicates that she was transferred because of a discipline problem.[2] *Id.*

---

[2] Defendants state that Richardson was transferred because she was afraid of dogs used in the Paws in Prison dog-training program at the Hawkins Unit. Doc. No. 70 at 2. Richardson disputes this is the reason she was transferred and contends that her complaints about dogs at the Hawkins Unit were largely ignored. Doc. No. 86. Why Richardson was transferred is not relevant or material to this case; neither is her experience with dogs at the Hawkins Unit.

### *McPherson Unit Policy and Procedures Number MCP 9.19.0*

McPherson Unit Policy and Procedures Number MCP 9.19.0 ("separation policy") provides for inmate separations. Doc. No. 69-7, *MCP 9.19.0.* The separation policy applies to inmates who identify another inmate as an enemy, or to inmates between whom there have been serious problems or altercations.[3] *Id.* at ¶V. It requires that appropriate measures be taken to prevent incidents when it is determined that certain inmates cannot exist together. *Id.* The separation policy sets forth procedures to identify an inmate's enemies, to maintain information about those enemies in inmates' institutional files, and regarding the issuance of enemy alerts. *Id.* at ¶VI.A.

Pursuant to the separation policy, a shift supervisor may temporarily separate inmates who are unable to co-exist until reviewed by the Chief of Security. *Id.* at ¶VI.B.1. If inmates are separated, the separation "should be from one barracks to another for separation and from one Housing Unit to another for enemies."[4] *Id.* If

---

[3] Defendant Aiken's declaration states that while separation orders are most often put in place when inmates have physical altercations, gang issues, or are a threat to one another, they are "also used in most cases of sexual misconduct and PREA related offenses and investigations." Doc. No. 69-2at 3. The separation policy does not specifically reference separation orders based on sexual misconduct or PREA related offenses.

[4] According to the declaration of Jeannie Long, the Classification and Assignment Officer at McPherson, there are two types of separation. One is a "housing" separation in which the separated inmates are housed "in different housing and the inmates are totally, physically separated." Doc. No. 69-3 at 1-2. The other is a "barracks" separation in

inmates can co-exist in the same housing unit, but should not reside together in the same barracks, "a separation notice will be filed in the count room file:  this information will be used primarily with job and housing assignments."  *Id.*  The separation policy also provides detailed procedures for "true enemy situations" and states that enemy alerts will be placed in inmates' institutional files whereas separation notices will not.  *Id.* at ¶VI.C.

### *The Separation from R.B.*

Shortly after Richardson's transfer to McPherson, on March 22, 2016, a separation order was entered to keep Richardson separated from R.B.[5]  Doc. No. 96. The order lists the type as "Other Separation," and the level as "Housing Area."[6]  *Id.* A note states "at this time it is a Housing Separation."  *Id.*  According to the Court's

---

which the separated inmates are "housed at the opposite ends of the barrack and you are not allowed to live together."  *Id.* at 2.

[5]  The Court understands that Richardson disputes the validity of the separation order and believes it was wrongly assigned and maintained as to her and R.B.  However, the propriety of the separation order is not an issue in this case.  The Court previously determined that Richardson did not exhaust a claim that entry of the separation order violated her equal protection rights.  *See* Doc. No.  31 at 19-20 & 23 (discussing grievances MCP 17-62 and MCP 16-1762).  Richardson has challenged the entry of the separation order as a retaliatory act by defendant Aiken in another case; those claims have been dismissed with prejudice.  *See Richardson v. Kelley*, No. 1:18cv8-JJV (Doc. No. 53).

[6] Defendants also submitted separation orders showing that Richardson was not to be housed with three other inmates at various times.  Doc. Nos. 69-8 – 69-10.  All of those separations were listed as "Other Separation" and for "Housing Area."  *Id.*  None appear to be relevant to Richardson's equal protection claims.

understanding of the types of separation, because this order was a housing separation, Richardson and R.B. were to be in different housing units and totally and physically separated.  The separation order does not state a reason for the separation.[7]

## IV. Analysis

### A.    *Sovereign Immunity*

Defendants correctly assert that Richardson's monetary claims against them in their official capacities are barred by sovereign immunity.  A suit against a defendant in his or her official capacity is in essence a suit against the State of Arkansas, and any official capacity claim for monetary damages against that defendant is barred by the doctrine of sovereign immunity.  *Will v. Michigan Department of State Police, et al.*, 491 U.S. 58, 71 (1989); *Nix v. Norman*, 879 F.2d 429, 431-432 (8th Cir. 1989).  Accordingly, the undersigned recommends that defendants be awarded summary judgment with respect to Richardson's official capacity claims.

---

[7] The defendants' statement of facts asserts that Richardson and R.B. were romantically involved, and that "Richardson was infatuated and obsessed with [R.B.]" Doc. No. 70 at 3.  Defendant Aiken's declaration states that Richardson was separated from R.B. in March of 2016, before she was moved to the McPherson Unit, "based on disciplinary reports that they had received."  Doc. No. 69-2 at 1-2. Aiken "carried on the decision to place Richardson and R.B. on separation.  It was a reasonable restriction based on circumstances because of what was going on with them."  *Id*. at 2.  Richardson disputes these assertions and claims that she and R.B. have never had a physical altercation, gang issue, or been a threat to each other.  Doc. No. 86 at 4.

**B.    *Qualified Immunity***

Defendants assert they are entitled to qualified immunity with respect to Richardson's individual capacity claims.  Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct.  *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).  Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1.    Legal Standard:  Equal Protection

Pursuant to the Equal Protection Clause of the Fourteenth Amendment, "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the

laws." U.S. Const. amend. XIV, §1. The Equal Protection Clause has been interpreted to require that "all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). In the prison context, "[t]he heart of an equal protection claim is that similarly situated inmates were treated differently and that this difference in treatment bore no rational relationship to any legitimate penal interest." *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *Timm v. Gunter,* 917 F.2d 1093, 1103 (8th Cir. 1990)). State actors therefore must treat similarly situated persons alike or have appropriate justification for failing to do so. *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir. 1996); *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999). Additionally, an inmate bringing an equal protection claim must show intentional or purposeful discrimination. *Klinger v. Dep't. of Corr.,* 31 F.3d 727, 733 (8th Cir. 1994).

One example of different treatment is insufficient to show that an inmate was "systematically and intentionally treated differently." *See e.g., Weiler v. Purkett*, 137 F.3d at 1051 ("A few individual examples of unequal treatment are insufficient to provide more than minimal support to an inference of classwide purposeful discrimination."); *Inmates of Neb. Penal and Correctional Complex v. Greenholtz,* 567 F.2d 1368, 1381 (8th Cir. 1977) (two or three individual cases of discrimination

insufficient to provide more than minimal support to an inference of classwide purposeful discrimination).[8]

Each of Richardson's claims is analyzed below along with the evidence submitted by the parties with respect to those claims.[9]

### 2.    Claims Against Classification Officer Jeannie Long

Richardson exhausted four claims against Classification Officer Long, all of which concern Richardson's housing assignment.   Defendants submitted the

---

[8] *See also Hansler v. Kelley*, No. 6:16-CV-06088, 2017 WL 3597893, at *9 (W.D. Ark. July 20, 2017), *report and recommendation adopted,* No. 6:16-CV-06088, 2017 WL 3592446 (W.D. Ark. Aug. 21, 2017) ("Nor does the fact that Plaintiff did not receive his Wiccan Bible when other Wiccan practitioners allegedly did, alone, state an unequal protection claim."); *Thrash v. White*, No. 5:09-CV-00095, 2010 WL 6749181, at *3 (E.D. Ark. Dec. 23, 2010), *report and recommendation adopted,* No. 5:09-CV-00095, 2011 WL 2110372 (E.D. Ark. May 27, 2011) ("An isolated example of unequal treatment is insufficient to establish that the difference in treatment was motivated by Plaintiffs' membership in a protected class, or that it burdened a fundamental right."); *Hughes v. Banks*, No. 1:07-CV-00027, 2011 WL 3861368, at *2 (E.D. Ark. Aug. 19, 2011) (equal protection claim failed where plaintiff only identified one inmate who was allegedly treated differently than him).

[9] Richardson filed responses to each of the defendant's declarations and attached various documents, including a number of sworn affidavits from other inmates.  Those documents which are relevant or provide helpful context to Richardson's claims are described in the Court's analysis.  Documents which are not relevant to Richardson's claims in this case include documents that pre- or post-date her claims in this case, documents concerning Richardson's fear of dogs at the Hawkins Unit, documents concerning her legal mail at the Hawkins Unit, copies of grievances, partial copies of policies, documents concerning unexhausted claims (including those pertaining to the validity of the separation order between Richardson and R.B.), and unsigned or unauthenticated writings.  *See e.g.,* Doc. No. 88 at 21; Doc. No. 91 at 29.

declaration of Long regarding these claims.  Because the declaration provides some general information relevant to Richardson's claims, that information is described first followed by a description of each claim against Long, and the evidence submitted by the parties with respect to each claim.

> a.     *Declaration of Jeannie Long*

Long is a Classification and Assignment Officer at the McPherson Unit.  Doc. No. 69-3 at 1.  She is responsible for moving inmates between cells or barracks based on job status, class, or medical restrictions.  *Id.*  Long states that she did not perform all movements of inmates because some were performed on nights or weekends while she was not at work.[10]  *Id.*  If Long decided to move inmates, she put the inmates' names on a spreadsheet and asked a Captain, Major, Deputy Warden, or Warden to approve the move.  *Id.* at 2.

Long claims that prison policy would have prevented her from moving white inmates with a history of sexual misconduct into cells or barracks with each other if a separation order was in place.  *Id.*  She explains that if an inmate has a separation order, the system "flags" the inmate as a precaution, and she cannot override that

---

[10] Richardson claims that while other staff may have moved inmates on the weekends or nights, Long was ultimately responsible for monitoring such movements and would review any moves that occurred while Long was out and make corrections, if needed.  Doc. No. 92.

flag without providing an explanation. *Id.* Long is familiar with the separation order for Richardson and R.B., which is a housing separation with all the restrictions. *Id.*

  b.    *Closed Barracks Claim*

Richardson claims that while Long refused to move her to "closed privileged barracks" despite her Class 1C status, she moved white inmates who had lower class status to closed barracks in September 2016. Doc. No. 2 at 13 (top and bottom of page) & 14 (top of page). This claim does not involve separation orders.

In her deposition, Richardson explained that she was a class 1C inmate housed in Barracks 8, which is a field squad barracks that houses class 3 and 4 inmates. Doc. No. 93, *Deposition Testimony of Angela Richardson dated September 26, 2019,* at 30. Richardson wanted to be moved into a "privileged" closed barracks, which she explained houses one inmate per room as compared to an open barracks with "40 or 50 loud inmates that's on field squad." *Id.* at 31-32. Richardson testified that she asked Long to move her, but Long refused. *Id.* at 32. Richardson testified that Long told her to request a job change in order to be moved, and she did. *Id.* She said:

> When I put up for a job change, I went to Classification with two other Caucasian women out of that barracks in 8 Barracks. That night she [Long] moved the two Caucasians, she left me in the barracks. They got moved to the equal as other Class 1-Cs in Barracks 5 and Barracks 11.

*Id.* Richardson further testified that shortly after, Long moved another white inmate, L.R., into 12 Barracks, a privileged barracks, as a class 2 inmate while Richardson remained in 8 Barracks with field squad workers. *Id.* at 32-33. Richardson also claims that Long moved R.T., a Class 4 Caucasian inmate, into 12 Barracks. *Id.* Richardson indicated that Long moved R.T. into the same barracks as one of Long's administrative porters who was friends with R.T. *Id.*

In her declaration, Long states that Richardson had a medical restriction (a prescription for a bottom bunk because of her knees) that prevented her from being moved into a closed barracks because a bottom bunk was not available. Doc. No. 69-3 at 2. According to Long, L.R. was moved to a closed barracks because she had no medical restrictions. *Id.* at 3. Long also states that she was not responsible for moving inmate R.T., who was moved at night by Lieutenant Chapman. Doc. No. 69-3 at 3. Long does not address whether she moved the other two white inmates referenced by Richardson as being moved to closed barracks despite their lower class. She does, however, state that Richardson was moved to a closed Class 1C barracks on September 26, 2016. In response to Long's declaration, Richardson did not submit any affidavits by those inmates she claims were moved to a closed barracks despite having a lower class.

Long has provided a reasonable justification for moving L.R. before Richardson was moved. She has also denied making the decision to move R.T.

14

Richardson has not refuted Long's assertion that L.R. had no medical restrictions while Richardson did, or that Long was not responsible for moving R.T. Richardson does not refute that she was moved to a closed barracks on September 16, 2016. Removing those claims from consideration, Richardson is left with her claim that two white inmates were moved into a closed barracks before she was with no justification. Doc. No. 93 at 32. Viewing the evidence in the light most favorable to Richardson, those two claims alone are insufficient to establish intentional or purposeful discrimination based on race. *See, e.g., Weiler v. Purkett*, 137 F.3d at 1051. For these reasons, the Court recommends that Richardson's closed barracks claim against Long be dismissed with prejudice.

> c.    *Punitive Isolation Claim*

Richardson's second claim against Long is that Long released a white inmate, B.S., from punitive isolation before Richardson was released, although Richardson had been there longer. Richardson claims that she and B.S. had been charged with the same infraction and that B.S. had a more serious disciplinary history than Richardson. Doc. No. 2 at 17 (bottom of page). In her deposition, Richardson explained, "[t]his inmate, [B.S.], she's a Caucasian, we had the exact same charge. It was a battery charge. And I probably got put in Segregation a week before her." Doc. No. 93 at 36. According to Richardson, she and B.S. both "got 30 days [in isolation], I believe." *Id.* at 38.

Richardson explained that when a room was needed in segregation, Long released B.S. instead of her even though Long knew that Richardson had been in segregation longer than B.S., and that B.S. "had just come off suicide watch and had a pending DR and a much longer disciplinary history than myself." *Id.* at 38. Richardson acknowledged that B.S. was returned to segregation the day after her release because she was placed on suicide watch. *Id.* at 39. Richardson claims she filed a grievance against Long, and Long responded that "it was a mistake." *Id.*

In her declaration, Long states that she did not move inmate B.S. Doc. No. 69-3 at 3. She provides no other information about B.S. Richardson did not submit an affidavit by B.S. or any other evidence regarding this claim. Viewing the evidence in the light most favorable to Richardson, this claim is insufficient to establish intentional or purposeful discrimination based on race. The Court therefore recommends that it be dismissed with prejudice.

### d. November 2016 Separation Claim

Richardson's third claim against Long is that Long separated her from R.B. in November 2016, while allowing white inmates C.T. and K.G. to be housed together or attend activities together despite their history of sexual misconduct. Doc. No. 2 at 14 (bottom of page) and 15 (top of page).

Long did not submit any evidence specifically regarding this claim. She states that she "could not have moved white inmates with a history of sexual misconduct

with each other onto the same floor (while the separation remained in effect) because I was required to follow the policy." Doc. No. 69-3 at 2. She further states that policy prohibited her from "overriding" a separation order to move white inmates with a history of sexual misconduct into the same housing while the separation "continued to apply to Richardson." *Id.*

Richardson submitted an affidavit by C.T. in support of her claim. Doc. No. 91 at 11. In her affidavit, C.T. states "[i]n 2016 Jeannie Long put me on the movement to move in the barrack with my sexual misconduct seperation [sic] . . . with [K.G.]. Lt. Michael Richardson is the one that stopped the movement. Mrs. Long is the one over movements/classification not Lt. Richardson." *Id.* C.T. does not indicate whether the separation in place between her and K.G. was a barracks separation or a housing separation, and there is no other evidence in the record of what type of separation was in place. As stated earlier, in a barracks separation, inmates are to be housed at opposite ends of a barracks and may not live together. In a housing separation, the inmates are housed in separate housing units and have no contact whatsoever.

Richardson's evidence fails to establish that she and C.T. were similarly situated but treated differently. Richardson and R.B. had a housing separation, and therefore could not be housed in the same barracks or have contact with each other. There is no evidence of what type of separation was in place for C.T. and K.G. If it

was a barracks separation, policy would allow Long to place them in the same barracks as long as they did not live together. The proof offered by Richardson on this claim simply fails to establish that she and C.T. were similarly situated. It also fails to establish that Long's actions were taken intentionally and purposefully to discriminate against Richardson because of her race. The Court therefore recommends that this claim be dismissed with prejudice.

e.    *November 2017 Separation Claim*

Richardson's final claim against Long is that Long moved white inmates D.A. and B.C., who shared a history of sexual misconduct and violence, onto the same floor in November 2017 while the separation order continued to apply to her and R.B. Doc. No. 2 at 20 (middle of page). In her deposition, Richardson testified that Long moved D.A., her former administrative porter, into a room with her companion, B.C., after they had been separated. Doc. No. 93 at 49. Richardson stated that these two inmates were subsequently reported for sexual misconduct again. *Id.*

Long did not submit any evidence specifically regarding this claim. The Court notes her general affidavit testimony summarized above concerning the November 2016 claim against her. Doc. No. 69-3. Richardson did not submit affidavits of D.A. or B.C., or any other evidence, establishing the type of separation order issued as to D.A. and B.C. She fails to establish that she and R.B. were similarly situated to D.A.

and B.C. but treated differently.  There is no evidence of what type of separation was in place for D.A. and B.C.  If it was a barracks separation, policy would allow Long to place them in the same barracks as long as they did not live together.  The proof offered by Richardson on this claim simply fails to establish that she and R.B. were similarly situated to D.A. and B.C.  It also fails to establish that Long's actions were taken intentionally and purposefully to discriminate against Richardson because of her race.  The Court therefore recommends that this claim be dismissed with prejudice.

### 3.    Claim Against Assistant Warden Tami Jo Aiken

Richardson claims that Assistant Warden Aiken treated her differently than other inmates with separations.  Doc. No. 2 at 8 (top of page).[11]  Specifically, she identified B.N. and M.C. and Y.M. and K.N. as couples who were treated differently from her and R.B. in 2016.  She states that B.N. and M.C., who had a history of sexual misconduct and violent altercations, were housed "in the same housing unit but in different barracks," and were allowed to attend recreation, church, chow, and other events together.  *Id.*  As to Y.M. and K.N., Richardson alleges that Aiken failed to follow policy by separating them, and that they were housed in the same barracks despite a history of sexual misconduct.  Richardson also claims that after she filed a

---

[11] Richardson does not indicate the race of the individuals she claims were treated more favorably.

grievance, Aiken separated Y.M. and K.N., but later moved them back into the same barracks.  *Id.*

Richardson did not submit affidavits of B.N., M.C., Y.M., or K.N.  In her deposition testimony, however, Richardson discussed both couples.  She stated that B.N. and M.C. were placed in segregation, but were housed in the same barracks after being released from segregation. Doc. No. 93 at 10-11. She also testified that Y.M. and K.N. were long-time companions on whom a PREA investigation was conducted in April of 2016.  According to Richardson, Aiken and others conducted the investigation, which found the PREA allegations to be false.  After the investigation, Aiken allowed them to be housed together in the same barracks even though they had a history of sexual misconduct.  *Id.* at 17-18.

Defendants submitted the declaration of Assistant Warden Aiken in support of their motion for summary judgment.  Aiken served as a Deputy Warden at the McPherson Unit for a year and a half during 2016-2017.  Doc. No. 69-2 at 1.  Her job responsibilities relevant to this case included overseeing the classification process; reviewing all incident reports, disciplinary reports, use of force reports and investigations; completing necessary reports and other administrative paperwork; and conducting high level investigations.  *Id.*

Aiken explains in her declaration that separation orders may be necessary to separate inmates who have serious problems or altercations.  *Id.*  at 2.  She explains

that separation orders may be used to separate inmates who have been involved in physical altercations, have gang issues, are a threat to the safety of another individuals, or have engaged in sexual misconduct or are the subject of a PREA investigation. *Id.* She states that such separations are not punitive in nature and are intended to protect the safety of inmates. *Id.* Aiken further explains that male inmates are often transferred to other prison units to accomplish a separation, but female inmates cannot always be transferred because there are only two prison units in Arkansas that house female prisoners. *Id.*

According to Aiken, Richardson was separated from R.B. by Warden Darryl Golden before Richardson was transferred to the McPherson Unit from the Hawkins Unit.[12] *Id.* at 2-3. Aiken "carried on the decision" to separate Richardson and R.B., and she was responsible for enforcing the separation order. *Id.* Aiken claims that she carried out the separation order without paying attention to other separations in the Unit, and she did not treat Richardson any different than other inmates who had separation orders. *Id.* at 3. Aiken states that she maintained the separation order based on her knowledge of the facts of the issue, her understanding of policy, her experience, and in consultation with her chain of command and the multidisciplinary

---

[12] Aiken explains that R.B. could not be housed at the Hawkins Units because of her custody level and Hawkins' status as a lower security level prison. Doc. No. 69-2 at 2.

classification committee.  *Id.* at 3.  Aiken does not specifically address any of the inmates Richardson claims were treated differently than her.

Defendants also submitted the declaration of Classification Officer Long. Long states that B.N. and M.C. had a barracks separation at the relevant times.  She further states that Y.M. and K.N. had no separation order.  Doc. No. 69-3 at 3.

The undisputed facts related to this claim fail to establish that Richardson and R.B. were similarly situated to B.N. and M.C. or Y.M. and K.N.  Richardson and R.B. were subject to a housing separation.  B.N. and M.C. were subject to a barracks separation.  Additionally, there is no evidence before the Court to establish that the barracks separation order as to B.N. and M.C. was based on facts sufficiently similar to the facts that led to the housing separation order that Warden Golden put in place and Aiken continued as to Richardson and R.B.[13]

The undisputed facts also fail to establish that Richardson and R.B. were similarly situated to Y.M. and K.N.  Richardson and R.B. were subject to a housing separation order. Y.M. and K.N. were segregated during a PREA investigation, which was found to be without merit; and after the investigation concluded, no separation order was issued.  Additionally, there is no evidence that the decision not to order a separation as to Y.M. and K.N. was based on facts similar to the facts that

---

[13] Richardson did not exhaust a claim that placement of the housing separation order violated her equal protection rights.  *See* footnote 5, *supra.*

led to the housing separation order in place as to Richardson.  Finally, the evidence before the Court fails to establish that Aiken's actions were taken intentionally and purposefully to discriminate against Richardson.  The Court therefore recommends that this claim be dismissed with prejudice.

      4.    <u>Claim Against Sergeant Roger Ayers</u>

Richardson claims that Sergeant Roger Ayers discriminated against her when he issued a disciplinary against her and three other African-American inmates who were using the law library in July 2016; she alleges that Ayers did not issue a disciplinary against the white inmates using the library at the same time.  Doc. No. 2 at 11 (bottom of page) & 12 (top of page).  In Richardson's grievance related to this claim, she identified M.W. as a white inmate who was not punished.  *See* Doc. No. 31 at 11; Doc. No. 2 at 65.

Defendants submitted the declaration of Ayers in support of their motion for summary judgment.   Ayers holds the title of camera operator/utility at the McPherson Unit.  Doc. No. 69-5 at 1.  He states he has no knowledge about African-Americans who were allegedly punished after a July 2016 investigation, and that his job is technical and he does not have the authority to punish inmates.  *Id.*

Richardson submitted a copy of a disciplinary violation charged by Ayers on July 21, 2016.  Doc. No. 90 at 4.  It states that he investigated a claim that inmate A.M. created a false list by adding names to the list of inmates with authorization to

visit the law library on July 12, 2016. Ayers stated that Richardson was one of the inmates whose name was added. Ayers documents that another inmate admitted adding names to the list. At the time, R.B. was assigned to the law library, and because of the housing separation order, Richardson was not authorized to be in the library at the same time. Ayers concluded that Richardson and another inmate were out of place of assignment when they came to the law library that day. A hearing was held July 29, 2016, and Richardson was found not guilty. *Id.* at 10.

Despite Ayers' statements in his affidavit, he did participate in an investigation and issue charges against Richardson and at least one other inmate. Richardson identifies M.W. as a white inmate who should have been, but was not, charged in the investigation by Ayers. She claims that other white inmates also should have been investigated but were not. There are no affidavits by other inmates involved in this incident or evidence of other disciplinaries issued.

Viewing the evidence in the light most favorable to Richardson, this claim alone is insufficient to establish that Ayers intentionally or purposefully discriminated against her based on race. Even if Richardson could prove that Ayers charged only African-American inmates and not Caucasian inmates after this incident, an isolated incident of unequal treatment is insufficient to show that she was "systematically and intentionally treated differently." *See e.g., Weiler v. Purkett*, 137 F.3d at 1051 ("A few individual examples of unequal treatment are

insufficient to provide more than minimal support to an inference of classwide purposeful discrimination."). The Court therefore recommends that Richardson's claim against Ayers be dismissed with prejudice.

4.    Claim Against Assistant Warden John Herrington – Law Library

Richardson claims that Assistant Warden John Herrington would not allow her to research in the law library with R.B. in October 2017, while he allowed white inmates B.S. and L.S. to research together despite their history as former lovers. Doc. No. 2 at 19 (top of page). Richardson also claims that Herrington advised her that she and R.B. would need court approval to research together whereas B.S. and L.S. were not subject to such a requirement. *Id.*

In her deposition testimony, Richardson explained that she and R.B. wanted to research together because they were planning on filing a class action discrimination lawsuit. Doc. No. 93 at 40. She said she asked Herrington for permission and he informed her she had to get verification from a judge.[14] *Id.* She testified that other inmates with separations were also allowed to research together, and that she told Herrington their names, and he said he would look into it. She said,

---

[14] Richardson submitted a copy of an inmate request she wrote to Herrington on October 17, 2017, regarding her request to use the law library with R.B. and two other inmates, and another one dated October 23, 2017, complaining that Herrington required her to get court approval to research with R.B. Doc. No. 88 at 12-13. While these inmate requests corroborate her allegations regarding Herrington's instructions to gain court approval to research together, they do not show that she was treated differently than similarly situated inmates.

". . . nothing happened behind it.  The rule only applies for me, you know.  The same policy for some reason, they got me under a different policy."  *Id.* at 47.

Defendants submitted the declaration of Herrington in support of their motion for summary judgment.  Herrington is the Deputy Warden at the McPherson Unit.  Doc. No. 69-1 at 1.  His job responsibilities include overseeing the operation of the Unit under the Warden.  *Id.*  Herrington states that he is familiar with Richardson and the housing separation order with R.B.[15]  *Id.*  Herrington claims that all inmates were allowed to research in the law library, but that Richardson and R.B. were not allowed to research in the law library at the same time.  *Id.*  According to Herrington, Richardson was allowed to use the law library alternatively with R.B.  *Id.*

Herrington claims that staff went out of their way to make sure that Richardson was treated equally.  *Id.*  He says that Richardson's allegations that other

---

[15] Herrington claims that Richardson and R.B. were romantic girlfriends, and that Richardson was infatuated with R.B.  Doc. No. 69-1 at 2.  Richardson disputes this.  Doc. No. 88 at 2.  Herrington also states that R.B. did not request to lift the Separation.  Doc. No. 69-1 at 2.  He explains that policy requires both inmates to present a request stating that they wish the separation to be lifted.  *Id.*  Once both inmates request a separation to be lifted, Herrington could request the Warden's permission to lift the separation. *Id.* Richardson submitted a copy of a notarized letter purportedly signed by R.B. (with no attestation clause) complaining about the separation order with Richardson.  Doc. No. 86 at 32.  In the letter, writer questions why a separation was entered when she and Richardson had broken no rules and were not separated prior to Richardson's transfer to the Hawkins Unit in 2015.  *Id.*  She acknowledges that she was falsely accused of acting out sexually with Richardson in October 2015, but claims the subsequent investigation revealed those allegations to be without merit.  *Id.*  Richardson also submitted a copy of a grievance allegedly filed by R.B. on July 28, 2016, in which she questioned the separation order.  Doc. No. 86 at 34.  This evidence is not material because Richardson and R.B.'s relationship and the propriety of the separation order is not an issue in this case.

inmates were breaking the rules were investigated, and if those allegations were found with merit, corrective action was taken. *Id.* He claims he did not discriminate against Richardson. *Id.*

In response to the defendants' motion for summary judgment, Richardson claims that white inmates B.S. and L.S. who previously escaped together were allowed to research together. Doc. No. 88 at 2. Richardson submitted an affidavit by inmate B.S., in which she avers that Herrington continued to deny her certain privileges even after she was cleared of certain charges involving another inmate. Doc. No. 88 at 24-28. B.S. believes she is discriminated against because she is openly gay. *Id.* However, she does not address in her affidavit whether she was allowed to use the law library with inmate L.S. despite a separation.

In response to the evidence offered by the defendants, Richardson fails to produce evidence that she and R.B. were similarly situated to inmates B.S. and L.S. Richardson's evidence does not even prove that B.S. and L.S. were allowed to use the law library together despite the existence of a separation order. Additionally, even if they were allowed to use the law library together, there is no evidence before the Court that a separation order for B.S. and L.S. was a housing order instead of a barracks order. Accordingly, the Court concludes that this claim should be dismissed with prejudice.

5.    *Fitness Walk Claim Against Coach Spence*

Richardson alleges that Coach Spence denied her the opportunity to participate in a program called Fitness Walk on or around January 14, 2017, due to the separation order with R.B., but allowed other inmates with separations to participate.  Doc. No. 2 at 16 (bottom of page).  Richardson claims that prior to this date, Spence allowed Richardson and R.B. to participate in the class together.  *Id.* Richardson also claims that white inmates who were not eligible to participate because of their class were allowed to take the class.  *Id.*; *see also* Doc. No. 93 at 35. Specifically, Richardson claims that Spence allowed inmate S.J. to attend on January 14, even though she was a class 3 inmate and not approved to attend.  She claims Spence also allowed white inmate T.S. to attend Fitness Walk with M.L. on that date, even though they had served 30 days in punitive segregation for sexual misconduct and lived in separate housing units.  Doc. No. 2 at 16.  Finally, she claims that Spence allowed other inmates to attend that class who were from different housing units and with separations.  *Id.*

Defendants submitted the declaration of Spence in support of their motion for summary judgment.  Spence is a recreation supervisor at the McPherson Unit.  Doc. No. 69-4 at 1.  Her job responsibilities include supervising general recreation; holiday activities; 40 Plus Fitness Walk (for Class 1 and Class 2 inmates); Zumba Class (for Class 1 and Class 2 inmates); Free Fitness Dance Class (Class 1 and Class

2 inmates); alternate Saturdays of basketball and volleyball; Dance 2b Free (Class 1 inmates); and other recreation activities. *Id.*

Spence states that Richardson was either a Class 3 or 4 inmate and therefore could not participate in Fitness Walk class in issue. *Id.* Spence was not authorized to re-classify Richardson. *Id.* For classes that Richardson was qualified to attend, Spence states she would split sessions to accommodate the separation order between Richardson and R.B. *Id.* at 1-2. Spence states that she would have to remove Richardson from a particular session if R.B. were in it. *Id.* Spence does not refer to inmates S.J., T.S., or M.L. in her declaration.

In response to Spence's declaration, Richardson claims she was a class 1 inmate in January 2017, and that she had been approved to attend the Fitness Walk class. Doc. No. 89 at 1-3. She submitted a list of inmates approved to attend the class dated January 10, 2017, three days before the incident in issue, and that list includes her name. *Id.* at 5. She also submitted an affidavit by inmate S.J. who avers that she was class 3 in 2017 but was allowed by Spence to attend Fitness Walk and other fitness classes because she was one of Spence's favorite inmates. Doc. No. 89 at 6.

There is a question of fact regarding Richardson's class status on January 14, 2017. While Spence states a belief that Richardson was class 3 or 4 on the date in issue, she also states that if Richardson was eligible by class, she would have

separated Richardson from R.B.  Viewing the evidence in a light most favorable to Richardson, the Court presumes that Richardson was a class 1, and was eligible to attend Fitness Walk on January 14, 2017.  The Court also accepts that Spence allowed inmate S.J. to attend Fitness Walk that day despite being class 3 status. Finally, the Court accepts that Spence allowed white inmate T.S. to attend Fitness Walk with M.L. on that date, even though they had served 30 days in punitive segregation for sexual misconduct and lived in separate housing units.

Despite these presumptions in favor of Richardson, the Court finds that the evidence offered does not establish that S.J.'s situation or the situation of T.S. and M.L. were sufficiently similar to Richardson's situation.  Richardson's complaint is that she was not allowed to participate in the fitness walk with R.B. because of the housing separation order.  S.J.'s situation is not related to any separation order.  And while T.S. and M.L. served 30 days in punitive segregation, there is no evidence that a housing separation order was in place as to them at the time in question, or at any time.   This claim should be dismissed with prejudice.

6.    <u>Dance 2b Free Claim Against Coach Virginia Spence & Assistant Warden John Herrington</u>

Richardson claims that in October 2017, Spence and Herrington singled her out and removed her from the Dance 2b Free fitness class due to the separation order with R.B. after allowing her to participate for one month.  According to Richardson, R.B. was "one of the instructors" of the fitness class.  Doc. No. 2 at 19 (middle of

page).  Richardson alleges that Herrington called Spence into his office regarding Richardson being on the same gym floor with R.B.; that he told Richardson during this office visit "of concerns" and that the "call" came from Dexter Payne; that he told Richardson that there was no paperwork or ADC violation that would justify the housing separation order as to R.B.; that he called the separation order frivolous but stated he could not remove it, and only Warden Tami Bradley could remove it. *Id.* at 19.  She alleges he did in fact remove the separations of white inmates.  *Id.* at 19 & 20 (top of page).

In his declaration, Herrington says he removed Richardson from Dance 2b Free Fitness class because of the separation order regarding R.B., but states that she was allowed to be in an alternative class.  Doc. No. 69-1 at 2.  Spence states in her declaration that Richardson was a Class 3 or 4 and that Dance 2b Free was only available to Class 1 inmates.  Doc. No. 69-4 at 1.  Spence further explained that she would split class sessions (for which Richardson and R.B. were both qualified) to accommodate the separation order between Richardson and R.B.  *Id.* at 1-2.

In response to the declarations by Herrington and Spence, Richardson claims there was not an alternative class she could take because R.B. taught all of the classes, and suggests she was denied **any** fitness opportunities.[16]  Doc. No. 88 at 3.

---

[16] Richardson states that "exercise is one of the basic human needs that prison officials must provide for under the Eight Amendment.  This was/is a necessary requirement for physical and mental well-being."  Doc. No. 88 at 3.  The Court notes this

She also claims that Herrington and Spence allowed other inmates with separations to be on the gym floor together at the same time. *Id.;* Doc. No. 89 at 2.

Richardson submitted several affidavits by inmates in support of this claim. Of those, the Court finds two that relate directly to inmates who allegedly had a housing separation. Doc. No. 89 at 13. In the first, inmate P.P. states she participated in Dance 2b Free under Spence, that R.B. is one of the instructors of Dance 2b Free, and that Spence allowed inmates S.A. and M., who have a housing separation, to attend "all events." *Id.* P.P. does not identify when S.A. and M. were allowed to attend all events, how she knows the nature of the separation order as to S.A. and M., or the basis for any such order.[17] Additionally, there is no evidence of S.A. and M.'s race.

In the second affidavit relating to inmates who allegedly had a housing separation, inmate S.B. states that in June 2019, she quit working for Spence as a recreation porter "due to the racism, favoritism and etc." Doc. No. 89 at 20. She

---

is inconsistent with Richardson's complaint, in which she stated that R.B. was **one** of the instructors of this class. Doc. No. 2 at 19. It is also inconsistent with Herrington's and Spence's affidavits stating that there were other such classes that Richardson could participate in. Finally, the grievances attached by Richardson to her response regarding claims against Spence (Doc. No. 89) do not contain any allegations by Richardson that she was denied all fitness opportunities in violation of the Eighth Amendment because of her housing separation from R.B. Richardson has not exhausted any such claim and it is not before the Court.

[17] Richardson states that the separation was due to a battery violation. Doc. No. 89 at 3.

states that Spence had an "issue" with homosexuality, but allowed one of her favorite inmates "and her woman do as they want. . . ." *Id.* She also claims that "I did activities as a rec porter and even work with all housing units and I had barracks and housing separation with inmates but yet she refuse and make other people not attend activities or certain exercise classes but yet let other inmates do it." *Id.* S.B. does not identify the "other people" who were not allowed to attend activities or the race or sexual orientation of people who were treated differently from her. S.B. also does not identify her own race or sexual orientation.

The other affidavits produced by Richardson related to Spence do not identify the existence of a separation order, or what kind of separation order was in place, or the race of the individuals involved. The Court does not consider these affidavits to contain facts sufficiently similar to the facts asserted by Richardson regarding this claim.

Additionally, the two affidavits that refer to housing separations fail to establish circumstances sufficiently similar to the facts Richardson asserts regarding this claim. They fail to establish the race of the individuals who were treated differently, and thus cannot be the basis of an equal protection claim based on race. Additionally, they fail to establish an equal protection claim based on sexual orientation. And even if the Court considers whether Richardson was singled out as a class of one for different treatment for some other reason, the affidavits described

above simply fail to support such a finding.    For these reasons, the Court recommends that this claim be dismissed with prejudice.

## V.   Conclusion

Defendants are entitled to summary judgment with respect to Richardson's official capacity claims.    The undersigned also recommends that the defendants' motion for summary judgment (Doc. No. 69) be granted and Richardson's claims against them in their individual capacities be dismissed with prejudice.    The defendants are entitled to qualified immunity.    Finally, Richardson's claim for injunctive relief should be dismissed.

SO RECOMMENDED this 3rd day of August, 2020.

_____
UNITED STATES MAGISTRATE JUDGE